DONALD E. BROWN, APPELLEE, v. ARMOUR & COMPANY, APPELLANT.

97 N. W. 2d 342

Filed July 3, 1959. No. 34578.

*Cassem, Tierney, Adams, Kennedy & Henatsch,* for appellant.

*Marks, Clare, Hopkins & Rauth,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

This is an appeal from a judgment of the district court for Douglas County awarding compensation for 16 weeks temporary total disability, and medical and hospital expenses in the total sum of $2,067.10. The amount of the award is not in dispute, the sole question being whether or not liability exists.

The plaintiff, Donald E. Brown, was an employee of the defendant Armour & Company from August 18, 1954, to August 6, 1957. Brown became ill on August 6, 1957, and was hospitalized the following day. In January 1958, he was informed that his illness had been diagnosed as leptospirosis. It is contended by the plaintiff that the disease was contracted through cuts or abrasions incurred while working as a tail skinner in defendant's packing plant and that leptospirosis is an occupational disease acquired while in the employ of the defendant. The defendant asserts that leptospirosis, particularly the type thereof contracted by the plaintiff, was incurred prior to his employment by the defendant and that, in any event, it is not an occupational disease in that it is not characteristic of and peculiar to the particular occupation of slaughtering and processing livestock. Before discussing the issues raised by the appeal it appears necessary to generally discuss the dis-

ease of leptospirosis as revealed by the medical evidence offered in the instant case.

The general conclusion reached as to the disease of leptospirosis is that it is not a new disease in this country but is apparently a newly recognized disease. None of the medical experts who testified had ever treated or come in contact with the disease previous to the present case. Leptospirosis is primarily a disease of rodents. Man and domestic animals have become infected with the disease where external environment is favorable. There are 32 or more known varieties of the disease which have been isolated and each appears to have a different place of origin and, generally speaking, a different host or carrier. The disease is contracted primarily from the excreta of animals. We are here concerned primarily with five types of leptospirosis. Three are found generally in this country. They are: icterohaemorrhagiae usually associated with rats, the canicola usually associated with dogs, and the pomona usually associated with cattle and other domestic livestock. The other two varieties with which we are primarily concerned are the semeranga and sejroe strains usually found in tropical or sub-tropical areas and generally not common to domestic animals. It is shown by the medical evidence that infection in humans caused by one variety of the disease will cause a weaker reaction to several other varieties. In determining the type of leptospirosis, the one showing the strongest reaction by recognized tests is presumed to be the offending variety.

In the instant case blood tests were made by Dr. Norman G. Miller, Assistant Professor of Microbiology at the College of Medicine, University of Nebraska. The evidence of Dr. Miller is that the determination of the strain or variety of leptospirosis is by the agglutination-lysis test. The basis of the test is to measure the antibodies that are produced to combat the antigens that have been placed in the blood stream for the purposes of the test. The greater the proportion of antibodies

thus developed to the type of antigens used, the more significant is the type of leptospirosis allied to the antigen used in the test. Dr. Miller had available the antigens to test for ictero, canicola, and the pomona varieties of leptospirosis. In the use of these three antigens the tests indicated by the titer thus arrived at that the plaintiff was infected with the pomona variety usually found in cattle and other domestic livestock. Dr. Miller gave as his conclusion in the matter that it is a possibility that plaintiff was infected while employed as a tail skinner by the defendant but that "I can't say, I just can't say that he was infected there."

The evidence shows that Dr. Miller caused the blood of plaintiff to be tested for leptospirosis by the Walter Reed Army Institute of Research, admittedly the best laboratory in the country for determining the strain of leptospirosis with which a person is infected. In making the tests the Walter Reed Research Laboratory used 18 of the 32 antigens rather than only the three used by Dr. Miller. The tests pointed definitely to the semeranga and sejroe strains as being the varieties with which the plaintiff was infected, although weaker reactions were indicated as to other varieties, including the pomona. The semeranga and sejroe strains have their origins in the Far East and are not generally associated with cattle and domestic livestock.

The evidence shows that plaintiff was inducted into the army in 1947. He was hospitalized for a period of 4 months and discharged from the army at the end of 6 months. After his discharge from the army plaintiff was employed by the Dubuque Packing Company and the John Deere Dubuque Tractor Works, both of Dubuque, Iowa. His record in the army, with the two former employers in Dubuque, Iowa, and with the defendant, was one of continued absenteeism and sick leave. The symptoms evidenced on those occasions were similar to those indicating leptospirosis. His illness in the army and the symptoms to which he testified,

plus the fact that the army afforded a means of carrying or communicating Far Eastern types of leptospirosis, such as semeranga and sejroe, affords some measure of corroboration of the findings of the Walter Reed Research Laboratory. This evidence also supports the contention that plaintiff was infected with leptospirosis before he was employed by the defendant.

The evidence shows that plaintiff was working for defendant in an environment conducive to the contracting of leptospirosis of the pomona variety. On the other hand, the evidence shows that plaintiff had symptoms of the disease long before he was employed by this defendant. The conclusions of the medical experts were based on the favorable working conditions for communicating the disease and on the reports of the tests made by Dr. Miller and the Walter Reed Research Laboratory. It is clear from the evidence that the tests made by the Walter Reed Research Laboratory were far more extensive than those made by Dr. Miller. In testing with three antigens for the strains more commonly found in this country and generally associated with animals, the reactions reported would not necessarily include those of other varieties of the disease. The use of 18 of the 32 antigens of all generally known varieties of leptospirosis would necessarily discover reactions indicating other strains of the disease which Dr. Miller could not find in his limited tests. It is not disputed in the medical evidence that the more extensive tests made by the Walter Reed Research Laboratory indicate that plaintiff was infected with the semeranga or sejroe varieties of leptospirosis. Since these types may be carried from overseas by military forces and the plaintiff having demonstrated symptoms of the disease while hospitalized in the army, a possible source of infection of the semeranga and sejroe varieties of leptospirosis is shown by the record. The medical history of the plaintiff, the nature of the various environments in which plaintiff had worked, and the unimpeached findings of the Walter

Reed Research Laboratory indicate that the finding that plaintiff was infected with leptospirosis pomona while employed by the defendant is highly speculative and conjectural.

This court has held in a long line of cases that the burden of proof in a compensation case is upon the plaintiff and that an award of compensation cannot be based on possibilities, probabilities, or speculative evidence. Snodgrass v. City of Holdrege, 166 Neb. 329, 89 N. W. 2d 66; McCall v. Hamilton County Farmers Telephone Assn., 135 Neb. 70, 280 N. W. 254; Townsend v. Loeffelbein, 123 Neb. 791, 244 N. W. 418. The evidence adduced in the case at bar falls within the inhibitions of this rule.

It is urged also that leptospirosis is an occupational disease common to packing houses. Our statute defines an occupational disease as follows: "(3) The term 'occupational disease' shall mean only a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process or employment and shall exclude all ordinary diseases of life to which the general public are exposed." § 48-151, R. R. S. 1943.

Assuming that the disease of leptospirosis pomona was established as the cause of plaintiff's illness, the record will not sustain a finding that it is an occupational disease within the meaning of the foregoing definition. There is no evidence that this disease was ever previously contracted by a packing-house employee. The doctor who testified, including the company physician, had never previously come in contact with the disease. There is no evidence in the record that leptospirosis or any of its varieties are characteristic of or peculiar to the meat-packing industry or the particular work in which plaintiff was engaged while in the employ of the defendant.

We necessarily conclude that the plaintiff failed to establish by a preponderance of the evidence that plain-

tiff contracted leptospirosis pomona, that it was contracted while in the employ of the defendant, or that it is an occupational disease within the meaning of section 48-151, R. R. S. 1943. The judgment of the trial court is based on evidence which is speculative and conjectural, and, consequently, insufficient to sustain an award under the Workmen's Compensation Act.

REVERSED.