RONALD A. MILLER, APPELLEE, V. GOODYEAR TIRE & RUBBER
COMPANY AND THE TRAVELERS INSURANCE COMPANY,
APPELLANTS.
480 N.W.2d 162

Filed February 14, 1992.    No. 90-1166.

Richard D. Sievers, of Bruckner, O'Gara, Keating, Sievers & Hendry, P.C., for appellants.

Rod Rehm, P.C., for appellee.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

This is an appeal from a decision of a three-judge panel (one judge dissenting) of the Workers' Compensation Court

awarding plaintiff-appellee, Ronald A. Miller, 6⁶/₇ weeks' temporary total disability and certain medical expenses. Defendants, Goodyear Tire & Rubber Company, Miller's employer, and The Travelers Insurance Company, Goodyear's insurer, have appealed. Appellants assign five errors, which may be summarized to allege that the compensation court erred (1) in finding that "the Appellee's transient acantholytic dermatosis was an occupational disease where the preexisting disease was not an occupational disease as required [by] Neb. Rev. Stat. §48-151 (4) (Reissue 1988)" and (2) in finding that "the Appellee's transient acantholytic dermatosis was a compensable occupational disease when there was no evidence that the only known aggravating factor, to-wit [sic]: heat or sweat, was unique or peculiar to Appellee's employment with Goodyear." We affirm.

The findings of fact made by the Nebraska Workers' Compensation Court after rehearing have the same force and effect as a jury verdict in a civil case and will not be set aside unless clearly erroneous. *Phipps v. Milton G. Waldbaum & Co., ante* p. 700, 477 N.W.2d 919 (1991); *Roan Eagle v. State,* 237 Neb. 961, 468 N.W.2d 382 (1991). In testing the sufficiency of the evidence to support findings of fact made by the compensation court after rehearing, the evidence must be considered in the light most favorable to the successful party, *Phipps v. Milton G. Waldbaum & Co., supra,* in this case, the appellee, Miller.

Miller started work for Goodyear in 1976. At that time he had never been treated for a skin disorder. From 1976 to 1989, Miller worked in the hose department at Goodyear making radiator hose. His job, described as "hose pulling," consisted of dipping raw rubber in various chemicals and loading it on mandrels. The rubber was then baked for approximately 15 minutes to a temperature of over 300 degrees. After the rubber was cooked, Miller removed the rubber from the oven and pulled the rubber off the various mandrels, in rotation. Miller testified, "You just keep going from one pot to another, and you just rotate them back and forth. Or if you are on one single pot, you just take that one end . . . so it's just kind of back and forth."

When asked if he got breaks away from the hot environment, Miller testified, "[I]f you can beat the time and get done before that, they do have a picnic table we sit down on, but it's right in the area. There's no cool — I mean, they have a cool room, but that's basically for your lunches."

Miller testified that the job was "a hot physical job." Near the ovens, the temperature reached as high as 125 to 128 degrees, and the ovens and the rubber gave off heat. The workers were dripping wet with sweat at all times of the year. They regularly came into contact with the chemicals. Conditions had been the same since Miller started working for Goodyear in 1976.

While working in this heat, Miller wore protective clothing, including thick cotton sleeves, worn from the wrist to above the elbow, and gloves. He wore a headband to keep the sweat out of his eyes.

Miller was exposed to three different chemicals when he was pulling hose. Goodyear provided information, admitted into evidence, about these chemicals. The information indicated that all three chemicals could cause skin irritation. The first product, cyclohexanone, "is a moderate skin irritant and repeated or prolonged exposure can cause irritation or dermatitis." (Emphasis omitted.) The information on the second chemical, Ucolic, stated that it causes eye and skin irritation. The third product, "hose bloom," "may irritate the skin of some individuals if prolonged and repeated contact is encountered." (Emphasis omitted.)

The expert witnesses, the dermatologists who treated or examined Miller, could not evaluate the contributing effect of the various chemicals on Miller. Dr. Rodney Basler's opinion was that "patch testing" to try to determine the effect of the individual chemicals was "of no diagnostic value whatsoever in dermatologic conditions in which the entire environment is incriminated in aggravating an inflammitory [sic] dermatosis." Dr. Basler reaffirmed, "Again it is the overall work environment which contributed to the aggravation of Mr. Miller's underlying disease."

Dr. Suzanne Braddock, another dermatologist, wrote that "to confirm that *chemicals* are *directly* responsible we would

have to [do a] 'patch test.' " (Emphasis that of Dr. Braddock.)

In 1988, Miller began to develop skin problems. The problems began with a rash in the area of his headband. The rash then spread to his arms, chest, back, and legs. The rash was itchy and bleeding. In November 1988, Miller went to the plant physician, who attempted to treat the problem for about 2 weeks before sending Miller to dermatologists in December 1988. The dermatologists did a biopsy on December 16, 1988, and the results were consistent with transient acantholytic dermatosis (TAD), also known as Grover's disease. The dermatologists prescribed various medications, including Accutane, steroids, and prednisone, to treat the rash through the spring and summer of 1989, but the medications were ineffective.

TAD is a relatively rare disease. Dr. Basler testified that the biochemical background of TAD is unknown in the scientific community, but that it is usually associated with heat and sweating. Basler testified that he believed that Miller's TAD "may have been instigated or originated with a heat-related experience at work," but that "it would be impossible to say that that's definitely what caused the disease."

Basler testified as a witness for defendants and testified that the TAD was aggravated by Miller's work at Goodyear. The following dialogue took place:

Q Doctor, in your opinion, was there an aggravation of the underlying TAD that occurred when Mr. Miller would return to work at the Goodyear plant?

A I do believe that.

Q Now, when you use the term "aggravation" in responding to my question, what do you mean by "aggravation"?

A During periods of time when he — we had cleared him up, from being away from his job and using the internal medications, particularly the cortisone, the steroid-type preparations, when he would return to work, I would ask him to return to see me within a week, and he would return with the same type of lesions that he had initially that were red, itching, sometimes fluid-filled, weeping, sometimes crusted.

In July 1989, Miller's condition was so bad that Dr. Basler insisted Miller leave the plant for a time. At times his body was covered with blistered, bleeding lesions. Miller said he had trouble sleeping when the rash was bad. He described his legs, arms, and chest as "raw," and he was unable to get haircuts because his head was covered with the rash. "I would just itch. Back then it was really bad. It was to the point where I couldn't stand it." Miller was away from work from July 10 to July 24, 1989. During that time he was taking steroids, and his condition cleared up completely.

The day Miller returned to work, he started in the hose department at his old job. By 11 a.m., his rash returned. Miller only worked in the hose department a few days before Goodyear arranged to temporarily transfer him to another job. His condition cleared slightly.

The doctors wanted to see if Miller's condition would improve without drugs if he were away from the plant. Miller was off work from November 1 to December 13, 1989. During this time, he used only a salve to soothe the itching. His skin condition cleared.

When Miller returned to Goodyear in December 1989, he was assigned to a job packing belts, which was outside the hose department. Miller earned 50 to 60 cents an hour less than he did in the hose department. The conditions were cooler in the packing job, and Miller did not come in contact with any chemicals. He did not sweat much in the packing department. Miller developed a minor rash, but "[it was] nothing like it ha[d] been in hose."

Miller worked packing belts until June or July 1990, when he was moved to another job at Goodyear. The conditions were a little hotter than in the packing job, and the pay was comparable.

Since Miller left the hose department, he has not sought help for his rash other than to obtain a salve that he uses "when [he] need[s] it." He has not suffered a major outbreak since he left the hose department, with the exception of an outbreak on his arm after he momentarily entered a chemical room.

After the rehearing, the compensation court found that there was "ample evidence with respect to the issue of causation" and

that plaintiff was entitled to benefits. In so finding, the court denied defendants' contentions that the heat in Miller's work environment was a condition common to many employments and that Miller's petition should be denied because this case represents only the aggravation of a preexisting dermatosis. Determination of causation is ordinarily a question for the trier of fact. *Kidd v. Winchell's Donut House*, 237 Neb. 176, 465 N.W.2d 442 (1991); *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990).

With respect to appellants' first summarized assignment of error, the compensation court held as follows: "We are persuaded that the employment conditions of the plaintiff at [Goodyear] aggravated his preexisting dermatosis to the point that the plaintiff was required to be off work . . . and to incur the medical expenses ordered to be paid." We agree with the majority of the compensation court panel.

The law is well settled that a preexisting disease and an accident may combine to produce a compensable disability under the Workers' Compensation Act. See, e.g., *Gilcrest Lumber Co. v. Rengler*, 109 Neb. 246, 190 N.W. 578 (1922) (accident combined with existing syphilis resulted in compensable injury); *Chatt v. Massman Construction Co.*, 138 Neb. 288, 293 N.W. 105 (1940) (long-existing rheumatism combined with a slip and fall into the Missouri River resulted in compensable injury); *Engel v. Nebraska Methodist Hospital*, 209 Neb. 878, 312 N.W.2d 281 (1981) (congenital spondylolysis combined with lifting accident resulted in compensable injury); *Kidd v. Winchell's Donut House, supra* (preexisting diabetes combined with a blow to the eye socket resulted in compensable injury).

Similarly, a preexisting disease and an aggravation of that disease may combine to produce a compensable injury, as we held in *Riggs v. Gooch Milling & Elevator Co.*, 173 Neb. 70, 74, 112 N.W.2d 531, 533 (1961), where we stated:

The law of this state has consistently recognized that the lighting up or acceleration of preexisting conditions by accident is compensable. We see no difference in principle in the situation before us. A disability brought about by employment conditions and a preexisting weakness or

disease, may be compensable if the conditions bringing it about are characteristic of and peculiar to the employment and do not result in a common disease to which the general public is exposed.

In *Riggs*, the claimant's medical testimony showed that "the inhaling of wheat dust in large quantities over a long period of time produces an irritation of the lungs and bronchial tree and *an aggravation of an existing abnormal condition* which may result in an emphysema reaching a disabling stage." (Emphasis supplied.) *Riggs, supra* at 75, 112 N.W.2d at 534.

We discussed the degree of proof required in a preexisting disability case in *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990). We expressly disapproved a heightened standard of proof when a preexisting disease or condition was involved. We stated:

[A] workers' compensation claimant may recover when an injury, arising out of and in the course of employment, combines with a preexisting condition to produce disability, notwithstanding that in the absence of the preexisting condition no disability would have resulted. Also, we stated in *Spangler* [*v. State*, 233 Neb. 790, 448 N.W.2d 145 (1989)]: "To sustain an award in a workers' compensation case involving a preexisting disease or condition, it is sufficient to show that the injury resulting from an accident arising out of and in the course of employment and the preexisting disease or condition combined to produce disability [citation omitted], or that the employment injury aggravated, accelerated, or inflamed the preexisting condition [citations omitted]." 233 Neb. at 795, 448 N.W.2d at 149.

Although a claimant with a preexisting disability or condition may face various obstacles, both medical and legal, and must satisfy the statutory requirements for an award under the Nebraska Workers' Compensation Act, an enhanced degree of proof, establishing a cause-and-effect relationship between a work-related injury and consequent disability, is not among a claimant's burdens for obtaining an award under the Nebraska Workers' Compensation Act.

*Heiliger, supra* at 468, 461 N.W.2d at 572.

If the aggravation clause of Neb. Rev. Stat. § 48-151(4) (Reissue 1988) requires that the claimant prove the preexisting disease is occupational, the aggravation clause adds nothing to the statute. Occupational diseases are already compensable according to § 48-151(4), which states, "The terms shall include disablement resulting from occupational disease arising out of and in the course of the employment in which the employee was engaged and which was contracted in such employment." Since disability arising from occupational diseases is already compensable, the aggravation clause adds nothing, with the possible exception of a situation in which the claimant's underlying condition or disease is caused by his work with firm A, the condition is aggravated by his work with firm B, and the claimant wishes to receive benefits from firm B. This set of facts would require the application of Neb. Rev. Stat. § 48-128 (Reissue 1988), which provides, in detail, for a Second Injury Fund.

Appellants' interpretation of the aggravation clause is not compatible with the language of § 48-128, which provides, in part,

> If an employee . . . has a preexisting permanent partial disability whether from compensable injury *or otherwise* . . . the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability.

(Emphasis supplied.) If we allowed compensation only for the aggravation of occupational conditions, then all preexisting permanent partial disabilities would be from "compensable injury" and the "or otherwise" language would be meaningless. Additionally, § 48-128 goes on to define preexisting permanent partial disability as "any preexisting permanent condition, *whether congenital or the result of injury or disease*, of such seriousness as to constitute a hindrance or obstacle to obtaining employment . . . ." (Emphasis supplied.) If we adopt the appellants' interpretation, §§ 48-128 and 48-151(4) of the Workers' Compensation Act are contradictory. Such a result should be avoided, if possible. We stated in *Indian Hills Comm.*

*Ch. v. County Bd. of Equal.*, 226 Neb. 510, 518, 412 N.W.2d 459, 465 (1987), " '[A] series or collection of statutes pertaining to a certain subject matter, statutory components of an act, which are in pari materia, may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible.' "

For the past 30 years, since *Riggs v. Gooch Milling. & Elevator Co.*, 173 Neb. 70, 112 N.W.2d 531 (1961), we have interpreted the Nebraska Workers' Compensation Act not to require proof that a preexisting condition was occupational before allowing recovery for a work-related aggravation of that condition. When a judicial interpretation of a statute has not evoked a legislative amendment, it is presumed that the Legislature has acquiesced in the court's interpretation. *Nelson v. Dolan*, 230 Neb. 848, 434 N.W.2d 25 (1989); *Mayfield v. Allied Mut. Ins. Co.*, 231 Neb. 308, 436 N.W.2d 164 (1989).

Appellants' first summarized assignment of error is without merit.

With regard to appellants' second summarized error, that is, that the panel erred in finding that the only known aggravating factor in Miller's condition was unique or peculiar to Miller's employment with Goodyear, we also agree with the panel's determination in that respect.

Appellants contend: "It is difficult to see how the heat in the plant would distinguish this occupation from a myriad of other occupations. Most work performed in the out-of-doors in a Nebraska summer causes the average worker to sweat, sometimes profusely." Brief for appellants at 19.

In this regard, the majority of the panel found as follows: "We have concluded that the excessive heat to which the plaintiff was exposed, which heat was sufficient to cause the plaintiff to drench his clothing with sweat, is a condition of the plaintiff's employment which distinguishes it in character from employment generally."

In making that finding, the panel majority did not mean "heat" in the abstract. The heat in which Miller worked was not just reflected in a high temperature, but that heat was only a part, albeit a large part, of the work environment. In

responding to a question posed by The Travelers, concerning the possibility of patch testing to determine if specific chemicals were causing Miller's problems, Dr. Basler stated in his March 6, 1990, report:

> In answer to specific questions posed by Mr. Paul A. Harold of the Traveler's, let me first answer that controlled setting exposure to chemicals of any type is of no diagnostic value whatsoever in dermatologic conditions in which the entire environment is incriminated in aggravating an inflammitory [sic] dermatosis. For that reason controlled exposure, specifically patch testing was not used . . . . Again it is the overall work environment which contributed to the aggravation of Mr. Miller's underlying disease.

Dr. Basler is of the opinion which lay common sense affirms, that the entire work environment is "incriminated" in aggravating Miller's condition.

The environment in which Miller worked cannot reasonably be said to be the same as the environment in which "a roofer, construction worker, carpenter, asphalt paver, garbage man, lifeguard, or tour guide at the zoo," brief for appellants at 19, would work. Rather than working in a confined area full of heat and chemicals, the workers referred to by appellants work in fresh outdoor air and at temperatures less than the temperatures to which Miller was continuously exposed.

The statutory requirement in § 48-151(3) is that the disease be "a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment . . . ." Section 48-151(4) includes the aggravation of a preexisting disease within the meaning of disease, so that a disease aggravated by conditions characteristic of and peculiar to a particular employment is likewise compensable.

In *Ritter v. Hawkeye-Security Ins. Co.*, 178 Neb. 792, 795, 135 N.W.2d 470, 472 (1965), we said:

> The requirement of the statute [§ 48-151(3)] is that the cause and conditions of the disease be characteristic of and peculiar to the employment and that the disease be other than an ordinary disease of life. The statute does not

require that the disease be one which originates exclusively from the employment. The statute means that the conditions of the employment must result in a hazard which distinguishes it in character from employment generally. . . .

. . . The evidence establishes that the cause and conditions of the disease are characteristic of and peculiar to the occupation of dishwashing and that dishwashing involves a hazard which is greater than that which occurs in employment generally.

Ritter was a dishwasher. The lower court had determined that plaintiff's disease was not characteristic of or peculiar to the plaintiff's occupation, but this court reversed that determination and held as set out above.

Similarly in this case, we affirm the panel majority's finding that the causes and conditions in this case are peculiar to Miller's occupation as a "hose puller."

Appellants' second summarized assignment of error is without merit.

Appellee's counsel is awarded a fee of $1,500 on appellee's fee in this appeal.

AFFIRMED.

BOSLAUGH, J., participating on briefs.