Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:09 PM CDT

Christine Thiele, appellant, v. Select Medical
Corporation, doing business as Select
Specialty Hospital, and Liberty
Insurance, Inc., appellees.

___ N.W.3d ___

Filed April 19, 2024.    No. S-23-022.

1. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.

2. \_\_\_\_: \_\_\_\_. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Workers' Compensation: Proof.** To show a compensable injury and recover under the Nebraska Workers' Compensation Act, a claimant must prove by a preponderance of the evidence that an accident or occupational disease arising out of and occurring in the course of employment caused an injury which resulted in disability compensable under the act.

4. \_\_\_\_: \_\_\_\_. To establish a claim for occupational disease under the Nebraska Workers' Compensation Act, a worker must show that the injury was a disease resulting from causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the worker was employed, and the disease is other than an ordinary disease of life to which the general public is exposed.

5. **Workers' Compensation.** To be compensable, Neb. Rev. Stat. § 48-151(3) (Reissue 2021) does not require that an occupational disease be one that exists exclusively in the particular employment. Rather, the causes and conditions of the employment must result in a hazard that distinguishes it in character from employment generally.

6. ____. Although the same diagnosis is also common in the community, a work-related injury may be a compensable occupational disease under Neb. Rev. Stat. 48-151(3) (Reissue 2021) because the worker's particular trade, occupation, process, or employment has characteristics that greatly raised the worker's risk and the injury is a natural result of that greater risk; that is, it would not be an ordinary disease of life for that worker.

Appeal from the Workers' Compensation Court: Daniel R. Fridrich, Judge. Reversed and remanded for further proceedings.

Douglas R. Novotny, of Novotny Law, L.L.C., for appellant.

Robert Kinney-Walker, of Law Offices of James W. Nubel, for appellee Select Medical Corporation.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## I. NATURE OF CASE

Christine Thiele, appellant, began feeling ill at work at the outset of the COVID-19 pandemic on April 6, 2020, and soon tested positive for a COVID-19 infection. As a result, Thiele developed severe and disabling medical issues from the effects of the COVID-19 virus. At the time of these events, Thiele was employed as a nurse liaison at Select Specialty Hospital (Select), a critical care recovery hospital located adjacent to Bergan Mercy Hospital in Omaha, Nebraska. Thiele petitioned for workers' compensation benefits, alleging that her COVID-19 infection was an injury that arose out of and in the course of employment under the Nebraska Workers' Compensation Act, Neb. Rev. Stat. §§ 48-101 to 48-1,117 (Reissue 2021). Thiele specifically claimed she suffered an "occupational disease" as defined in § 48-151(3). Select and Liberty Insurance, Inc., appellees, moved for summary judgment. The Nebraska Workers' Compensation Court granted appellees' motion for summary judgment and

dismissed Thiele's petition. Thiele appeals. Because there is a genuine issue of material fact as to whether in April 2020 Thiele suffered a compensable occupational disease or a non-compensable disease of ordinary life, we reverse the order and remand the cause for further proceedings.

## II. STATEMENT OF FACTS

### 1. Thiele's Employment With Select

This case was decided on summary judgment, and the facts recited below are expressed in the light most favorable to Thiele and should not be construed as binding on remand. Thiele was employed as a nurse liaison by Select, which operates a critical care recovery hospital adjacent to Bergan Mercy Hospital in Omaha. In March 2020, at the outset of the COVID-19 pandemic, Select designated Thiele, who normally worked remotely, as an essential health care worker and required her to report to the hospital for work. Thiele did not have a designated workspace, so she worked in various spaces, including the first floor breakroom, boardroom, lobby, or breakrooms on patient floors. She worked in close quarters with three or four other coworkers and was also in "constant contact" with other nurses, doctors, and medical personnel, as well as other individuals who were in contact with employees, patients, and visitors at Select and Bergan Mercy Hospital. During the week of March 30 to April 3, 2020, she delivered doughnuts to Bergan Mercy Hospital's intensive care unit and delivered other items to hospital staff.

Starting on March 19, 2020, Omaha began experiencing official lockdowns or directed health measures, and individuals could go to very few locations. Under these directed health measures designed to minimize inperson interaction, gatherings were prohibited and schools, daycare facilities, gymnasiums, salons, libraries, theaters, and any other confined indoor or outdoor spaces were closed. Restaurants were restricted to carry-out, drive-through, and delivery services.

The Nebraska Department of Health and Human Services recommended that health care workers involved in the care of patients with known or suspected COVID-19 wear either respirators or face masks. Select denied Thiele's requests to wear a face mask. At Select at that time, face masks were not worn by hospital employees, patients, visitors, or other individuals unless they had direct contact with patients. Select acknowledged that face masks arrived or became available at the hospital on April 3, 2020, but they were not distributed to Thiele or the employees with whom she worked.

From March 16 to April 6, 2020, other than going to work or conducting duties for work, Thiele stayed at home. She avoided contact with friends and family outside her household and utilized grocery delivery services. The two other individuals in Thiele's home resided in the basement, and Thiele had little or no direct contact with them. Thiele was the only person at her residence who contracted a COVID-19 infection in March or April 2020.

On April 6, 2020, Thiele began feeling ill and left work early. On April 10, she received a positive test result confirming that she had a COVID-19 infection. Thiele was thereafter diagnosed with continuing severe medical issues and was rendered unable to work. She now receives Social Security disability benefits.

The Nebraska Department of Health and Human Services had reported only 412 COVID-19 cases to date in Nebraska on April 6, 2020. According to the 2020 census information from the U.S. Census Bureau, Nebraska's total population was 1,961,504 in 2020.

## 2. Thiele's Workers' Compensation Claim and Evidence

On March 7, 2022, Thiele filed a petition in the Nebraska Workers' Compensation Court in which she alleged that she suffered a compensable injury stemming from a COVID-19 infection she had acquired in the course and scope of her employment by Select. Appellees moved for summary

judgment and requested dismissal of Thiele's petition on the basis that a COVID-19 "infection and related sequalae are not compensable injuries as a matter of law." Thiele contended that under the conditions of her employment as a nurse liaison at a critical care hospital during March and April 2020, her COVID-19 infection was a compensable occupational disease. The compensation court conducted a hearing, and in addition to evidence from treating physicians, the court admitted into evidence two expert opinions regarding COVID-19 and materials regarding the pandemic. The court also received statements of undisputed facts submitted by the parties and a statement of disputed facts submitted by Thiele, and the trial judge synthesized these as undisputed facts.

### (a) Treating Physicians

Two of Thiele's treating physicians, Drs. Marco A. Gonzalez-Castellon and Karen Wilson, opined that more likely than not, Thiele contracted a COVID-19 infection during the course of her employment with Select, that she was exposed to a higher risk of contracting COVID-19 at her employment than other employments or than the general public, and that Select's denial of a face mask or other personal protective equipment at her workplace exposed Thiele to a hazard and a higher risk in relation to other employment.

### (b) Expert Opinions

#### (i) Dr. Sehr Haroon

Thiele offered an expert opinion report from Dr. Sehr Haroon, an internal medicine physician at the Nebraska Medical Center, prepared in 2022. Dr. Haroon opined that, based on reports she reviewed from Thiele's treating physicians, she agreed that Thiele more likely than not contracted COVID-19 during the course of her employment with Select. Dr. Haroon explained that because COVID-19 could spread through inhalation of large airborne droplets from someone shedding the virus in the same space, Thiele's infection in April 2020 was consistent with the history provided by Thiele

of using shared workrooms with frontline health care workers at a hospital without wearing a face mask.

Regarding the prevalence of COVID-19 in April 2020, Dr. Haroon explained that the COVID-19 pandemic was in a different situation from the present, because the virus was not "in the community" as it is now. She explained that "[a]t that time, [COVID-19] was a more virulent variant which carried with it risks of pulmonary involvement and death, vaccines were not available, and treatment options we now rely on were not yet known." She cited and attached two academic articles discussing that in the early months of the pandemic before the benefits of herd immunity, vaccinations, and milder variants, frontline health care workers had an increased risk of contracting a COVID-19 infection and experiencing a severe outcome than the general communities in which they lived.

Dr. Haroon opined that when Thiele contracted her COVID-19 infection, inappropriate or inadequate personal protective equipment, inadequate workplace policies about mitigating COVID-19 spread, and inadequate screening of patients upon admission to the hospital all contributed to the spread of disease and preventable morbidity in health care workers. In particular, Dr. Haroon stated that as part of Thiele's employment, Thiele was exposed to the COVID-19 hazard and had "a higher risk of contracting [COVID-19] in relation to other employments and the general public."

### (ii) Dr. Todd Sauer

Appellees offered the expert opinion of Dr. Todd Sauer. Dr. Sauer is a physician board certified in family medicine with a certificate of added qualification in hospice and palliative care. In his July 2022 letter, Dr. Sauer stated that "[COVID-19] SARS-CoV-2" virus, like other respiratory viruses, is easily transmitted from person to person and therefore easily transmitted throughout communities. He opined that "[a]t this point" in 2022, it is an ordinary disease of life to which the general public is exposed and will continue to be exposed in

the years ahead. He cited a report by Johns Hopkins University that as of July 6, 2022, there were 88,066,096 cases of COVID-19 in the United States, and compared the incidence to influenza, which he said resulted variously in 9 to 41 million illnesses annually from 2010 to 2020.

### (c) Undisputed Material Facts

The parties submitted annotated statements of facts to the compensation court pursuant to Workers' Comp. Ct. R. of Proc. 3(E) (2022). In its ruling, the compensation court consolidated facts that it considered undisputed, including:

12. According to [Drs.] Haroon and . . . Gonzalez-Castellon, [Thiele] had a higher risk of contracting COVID-19 due to her employer's refusal to allow her to wear a mask. . . .

13. Both doctors also agree that [Thiele] had an increased risk of contracting COVID-19 compared to other employees in other employment fields or the general public. . . .

. . . .

15. On April 6, 2020, Nebraska had a total of 412 cases of COVID-19. . . .

. . . .

18. Drs. Haroon and Gonzalez-Castellon opine that it is more probable than not that [Thiele] contracted COVID-19 at work. . . .

. . . .

27. Early in the pandemic, healthcare workers had an increased risk of contracting COVID-19 compared to the general population. . . .

. . . .

33. At this point, most people in the United States have been exposed to COVID-19. . . .

34. COVID-19 is an ordinary disease of life to which the general public is exposed and will continue to be exposed in the years to come.

### 3. Compensation Court Order

The compensation court sustained appellees' motion for summary judgment and dismissed Thiele's petition. The court framed its ruling around § 48-151(3), which describes compensable "[o]ccupational disease" and excludes therefrom noncompensable "ordinary diseases of life." Occupational disease is defined in § 48-151(3) as follows: "Occupational disease means only a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment and excludes all ordinary diseases of life to which the general public is exposed."

In its December 13, 2022, order, the court acknowledged that COVID-19 is more prevalent in the health care field. The compensation court order generally repeats paragraph 27 of the undisputed facts, which states: "Early in the pandemic healthcare workers had an increased risk of contracting COVID-19 compared to the general population." The court nevertheless reasoned that to assess whether Thiele had an occupational disease in April 2020, it would refer to the incidence of COVID-19 in the community at the time of the hearing in 2022. Based on this reasoning, the court stated that "it is a disease of ordinary life." The court determined that, given the nature of COVID-19 incidence now, Thiele's infection caught at work at the beginning of the pandemic in 2020 was not an "occupational disease" as defined by § 48-151(3). The court sustained appellees' motion for summary judgment and dismissed Thiele's petition.

Thiele appeals.

### III. ASSIGNMENT OF ERROR

Thiele assigns that the compensation court erred when it determined that her COVID-19 infection, which she contracted while working for Select at the beginning of the pandemic in 2020, was not an occupational disease and granted summary judgment in favor of appellees.

## IV. STANDARDS OF REVIEW

[1] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law. *Dutcher v. Nebraska Dept. of Corr. Servs.*, 312 Neb. 405, 979 N.W.2d 245 (2022).

[2] In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id*.

## V. ANALYSIS

In this appeal, Thiele contends that the COVID-19 infection she contracted in early April 2020 is compensable as an occupational disease under the Nebraska Workers' Compensation Act and argues that her workers' compensation petition should not have been dismissed in summary judgment proceedings. The parties agree that, in this case decided on summary judgment, Thiele receives the benefit of all reasonable inferences deducible from the evidence, and they also agree, for the purposes of this motion, that Thiele contracted her COVID-19 infection while working for Select. The issue before us is whether the compensation court erred when it reasoned that because COVID-19 is now a disease of ordinary life, it could not have been an occupational disease in April 2020. As we explain below, the issue of whether Thiele suffered an occupational disease in April 2020 should be assessed by reference to whether her COVID-19 infection was a disease of ordinary life in April 2020 and not at the time of the hearing in November 2022. We believe the focus of the analysis should be on 2020, and the court's reasoning focusing on 2022 was error. Giving the inferences from the evidence in favor of Thiele as we must, there is a material question of fact as to whether in April 2020, under the applicable jurisprudence

pertaining to § 48-151(3), Thiele's COVID-19 infection was compensable as an occupational disease or was noncompensable as a disease of ordinary life. Accordingly, we reverse the order and remand the cause for further proceedings.

## 1. Legal Framework for
## Occupational Diseases

[3] To show a compensable injury and recover under the Nebraska Workers' Compensation Act, a claimant must prove by a preponderance of the evidence that an accident or occupational disease arising out of and occurring in the course of employment caused an injury which resulted in disability compensable under the act. See, § 48-101; *Picard v. P & C Group 1*, 306 Neb. 292, 945 N.W.2d 183 (2020).

We are aware of COVID-19 workers' compensation cases analyzing whether becoming infected with COVID-19 was an "accident." See, *Western Millwork v. Indus. Com'n of Arizona*, 256 Ariz. 177, 536 P.3d 305 (Ariz. App. 2023); *Pierre v. ABF Freight*, 211 A.D.3d 1284, 180 N.Y.S.3d 337 (2022) (treating COVID-19 infections as accidental injury where evidence showed claimant contracted COVID-19 in course of employment). However, in this case, the compensation court and this court have been asked to consider only whether Thiele's injury was caused by an occupational disease. We therefore limit our analysis accordingly.

Occupational disease is defined in § 48-151(3). It means "only a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment and excludes all ordinary diseases of life to which the general public is exposed." *Id*.

[4] To establish a claim for occupational disease under the Nebraska Workers' Compensation Act, a worker must show that the injury was a disease resulting from causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the worker was employed, and the disease is other than an ordinary disease of life to which the general public is exposed. See,

§ 48-151(3); *Ritter v. Hawkeye-Security Ins. Co.*, 178 Neb. 792, 135 N.W.2d 470 (1965).

[5] To be compensable, the statute does not require that an occupational disease be one that exists exclusively in the particular employment. See *Ritter v. Hawkeye-Security Ins. Co., supra.* Rather, the causes and conditions of the employment referenced in the statute must result in a hazard that distinguishes it in character from employment generally. See, *Risor v. Nebraska Boiler*, 277 Neb. 679, 765 N.W.2d 170 (2009); *Ritter v. Hawkeye-Security Ins. Co., supra.* It has been observed that "whether a condition or disease is an ordinary disease of life is essentially a medical issue to be decided by the trier of fact based on the evidence presented." *Knott v. Blue Bell, Inc.*, 7 Va. App. 335, 338, 373 S.E.2d 481, 483 (1988). We agree that under the language of § 48-151(3), it will generally be a factual issue for the trier of fact to determine after trial whether a worker has suffered an injury from an occupational disease or an ordinary disease of life to which the general public is exposed. In this regard, on the question of a worker's occupational disease, the Nebraska Workers' Compensation Court acts as the trier of fact to determine which, if any, expert witnesses to believe. See *Ludwick v. TriWest Healthcare Alliance*, 267 Neb. 887, 678 N.W.2d 517 (2004).

As has been observed in a treatise on workers' compensation law: "If the [condition of] employment is attended with unusual germs, poisons, chemicals, fumes, dusts, spores, or similar conditions," it is unlikely to be the result of an "ordinary disease," as that term is used in statutes. 4 Arthur Larson et al., Larson's Workers' Compensation Law § 52.03[3][a] at 52-11 (2023). Professor Larson's treatise also observes that where familiar harmful elements are present in unusual degree in the conditions of employment, the contracted disease is ordinarily distinguishable from ordinary diseases of life. See *id.*, § 52.03[3][b].

[6] In applying § 48-151(3), we have determined that, although the same diagnosis is also common in the community, a work-related injury may be a compensable occupational disease because the worker's particular trade, occupation, process, or employment has characteristics that greatly raised the worker's risk and the injury is a natural result of that greater risk; that is, notwithstanding the existence of the disease or condition elsewhere, for purposes of § 48-151(3), it would not be an ordinary disease of life for that worker. See, *Ludwick v. TriWest Healthcare Alliance, supra* (determining that surgical nurse who developed hypersensitivity to latex used in examination gloves suffered occupational disease); *Osteen v. A. C. and S., Inc.*, 209 Neb. 282, 307 N.W.2d 514 (1981) (determining that asbestos worker who contracted peritoneal mesothelioma suffered occupational disease); *Ritter v. Hawkeye-Security Ins. Co., supra* (determining that dishwasher who developed contact dermatitis after exposures at work to cleaners suffered occupational disease); *Riggs v. Gooch Milling & Elevator Co.*, 173 Neb. 70, 112 N.W.2d 531 (1961) (determining that grain elevator employee who developed emphysema suffered occupational disease); *Hauff v. Kimball*, 163 Neb. 55, 77 N.W.2d 683 (1956) (determining that granite cutter who developed pneumoconiosis silicosis after exposures to silica sand suffered occupational disease).

Diseases that exist in the larger population, such as tuberculosis and malaria, can be considered occupational diseases. Focusing on infectious disease, courts have found numerous conditions in workplaces support the award of compensation as occupational diseases, especially in hospital or intimate nursing settings: hepatitis (*Jeannette Dist. Memorial Hosp. v. W.C.A.B.*, 668 A.2d 249 (Pa. Commw. 1995), *Hansen v. Gordon*, 221 Conn. 29, 602 A.2d 560 (1992), *Sacred Heart Med. Ctr. v. Dept. of Labor, Etc.*, 92 Wash. 631, 600 P.2d 1015 (1979), *Booker v. Medical Center*, 297 N.C. 458, 256 S.E.2d 189 (1979), and *Matter of Esposito v. N. Y. S. Willowbrook State School*, 46 A.D.2d 969, 362 N.Y.S.2d 54

(1974)); tuberculosis (*Russell v. Camden Community Hospital*, 359 A.2d 607 (Me. 1976), *Matter of Pogue v. Crouse Irving Hosp.*, 281 A.D. 931, 119 N.Y.S.2d 842 (1953), *Board of National Missions v. Alaska Industrial Bd.*, 116 F. Supp. 625 (D. Alaska 1953), and *Matter of Quallenberg v. Union Health Center*, 280 A.D. 1029, 117 N.Y.S.2d 24 (1952)); malaria (*McCarty v. Delta Pride*, 247 Ga. App. 734, 545 S.E.2d 117 (2001)); herpetic whitlow (*Fox v. Newberry County Memorial Hosp.*, 319 S.C. 278, 461 S.E.2d 392 (1995)); Neisseria meningitides (*Omron Electronics v. Workers' Compensation*, 2014 IL App (1st) 130766WC, 21 N.E.3d 1245, 387 Ill. Dec. 74 (2014)). Diseases not ordinarily transmissible between humans have also been found to be occupational diseases. See *Montgomery v. Industrial Com'n of Arizona*, 173 Ariz. 106, 840 P.2d 282 (Ariz. App. 1992) (determining lyme disease is occupational disease). It has been observed that the heightened risk of the workplace provides the nexus between the disease and employment and makes the diseases appropriate subjects for an award of workers' compensation. *Booker v. Medical Ctr., supra*.

### 2. GENUINE ISSUES OF MATERIAL FACT AS TO WHETHER THIELE'S COVID-19 INFECTION WAS AN OCCUPATIONAL DISEASE IN APRIL 2020

Thiele claims that her COVID-19 infection contracted in April 2020 was characteristic of and peculiar to her employment as a nurse liaison whose duties included working in a critical care hospital and an intensive care unit where she was at a heightened risk of disease. Thiele claims her injury was an occupational disease under § 48-151(3). As we explain below, on this record, there is no absolute legal impediment to Thiele's request for compensation due to COVID-19 as an occupational disease in April 2020. See *Meeks v. Opp Health and Rehabilitation, LLC*, No. CL-2023-0239, 2024 WL 356481 at *5 (Ala. Civ. App. Jan. 31, 2024) (in case involving occupational disease, stating that "we are not

prepared to hold that COVID-19 is not compensable under the Act as a matter of law").

In its order, the court determined that in 2022, the COVID-19 virus "is anywhere people are" and "it is a disease of ordinary life," and that therefore, recovery for Thiele's injury suffered in 2020 is precluded. We believe the court's reliance on the situation in 2022 is flawed, its reasoning is erroneous, and reversal of its order is required.

There seems to be no dispute for purposes of summary judgment that Thiele contracted COVID-19 at her place of employment with Select during the March and April 2020 period. Whether causation is established on remand, we note that Professor Larson's treatise indicates that health care workers working on "the front lines of the pandemic" could expect to readily prove the causal connection between contraction of COVID-19 and the workplace. See 4 Arthur Larson et al., Larson's Workers' Compensation Law, § 51.06[2] at 51-14 (2023). Because we are reviewing an order made on summary judgment, we determine that, taking the inferences in favor of Thiele, the record, including undisputed facts, shows that Thiele suffered an injury in the course of employment and that her job carried higher risks compared to employment generally in the period of March and April 2020. Accordingly, at this stage, we do not comment further on the foregoing elements in this analysis, nor do we comment on whether they can be established by evidence in further proceedings upon remand. Thus, for purposes of this summary judgment analysis, wherein certain elements are treated as undisputed, the issue of whether COVID-19 was an ordinary disease of life in the period of March and April 2020 remains for our consideration. As we explain below, because the law permits an award of compensation for occupational disease due to a brief period of exposure, compensability, including the issue of whether the disease is one of ordinary life, should be judged at the period of exposure.

Although the relevance of "time-definiteness" as used in the cases to distinguish between accident and occupational disease may have been diminished by jurisprudential developments, time is still relevant in analyzing occupational disease claims. See 4 Larson et al., *supra*, § 52.03[1] at 52-5. E.g., *Morris v. Nebraska Health System*, 266 Neb. 285, 664 N.W.2d 436 (2003) (stating worker exposed to latex who suffered aggravation of her preexisting latex allergy had occupational disease, although she worked for the employer for only 5 months); *Hull v. Aetna Ins. Co.*, 247 Neb. 713, 529 N.W.2d 783 (1995) (examining causal conditions or contributory exposure of worker's disease at points in time at successive employers); *Osteen v. A. C. and S., Inc.*, 209 Neb. 282, 307 N.W.2d 514 (1981) (discussing whether successive employers exposed worker to asbestos). As we read § 48-151(3), to be compensable as an occupational disease, a claimant must demonstrate that the disease stemmed from an identifiable period of time, and it logically follows that the claimant must establish that the exposure was not an ordinary disease of life during that same time period as ordinary disease of life is used in the statute.

The COVID-19 jurisprudence demonstrates that in cases claiming occupational disease, the proper focus is on the period of exposure prior to contraction or onset of symptoms to determine whether the illness was an ordinary disease of life at those times. See, e.g., *Aungst v. Family Dollar*, 221 A.D.3d 1222, 1225, 199 N.Y.S.3d 291, 295 (2023) (stating that where worker contracted COVID-19 in April 2020, claim focused on the "relevant time period prior to contracting COVID-19"); *Employer: Long Island DDSO*, No. G233 5526, 2022 WL 594590 at *6 (N.Y. Work Comp. Bd. Feb. 16, 2022) (stating that where health care worker's onset of COVID-19 was April 6, 2020, record regarding exposure demonstrated requisite "events in time and space"); *Employer: Manhattan Psychiatric Center*, Nos. G281 3814, G280 2169, 2021 WL 5748736 (N.Y. Work Comp. Bd. Nov. 29, 2021) (same: health care worker with COVID-19 onset on April 10, 2020).

Courts have indicated that in COVID-19 cases, the factual focus for an ordinary disease of life analysis is at the time of onset, rather than in subsequent years. See *Taylor v. Posey*, No. 1042-22-4, 2023 WL 5021240 at *5 (Va. App. Aug. 8, 2023) (where worker contracted COVID-19 in April 2020, rejecting employer's "categorical approach to COVID-19" as a mere ordinary disease of life and "instructs courts to undertake a fact-specific analysis"); *Fowler v. Perdue Farm, Inc.*, No. CV K21A-01-002 NEP, 2022 WL 807327 (Del. Super. Mar. 16, 2022) (rejecting relevance of speculation that COVID-19 had spread to millions of Americans at time of court order in 2022, where worker contracted COVID-19 in March 2020).

The evidence in the record with regard to COVID-19 in March and April 2020 has been described above. Thiele's expert stated that at the time Thiele contracted COVID-19, there were only 412 cases in Nebraska; the cases were caused by a more virulent and deadly strain; Thiele worked in close contact with other health care workers and was prevented from wearing a face mask at work; and COVID-19 has mutated into milder and more widespread variants. Viewing the evidence in the light most favorable to Thiele, we determine it showed, as the compensation court noted in its order, that "early on in the pandemic, healthcare workers were more likely to catch COVID-19," and we can find no evidence to the contrary.

Thiele's expert witness, Dr. Haroon, stated that COVID-19 would present different risks to the community in 2022 than it did in early 2020. She opined that in 2020, "[h]ealthcare workers . . . had increased risk of covid [compared to] the general population early on in the pandemic, given their profession," and that "as the pandemic progressed, the virus mutated into milder variants, and vaccinations aided with herd immunity as well. This led to the virus being able to be found in the community, as [appellees' expert] Dr. Sauer pointed out."

The report of appellees' expert, Dr. Sauer, did not speak to the particular conditions of Thiele's employment with Select

in March and April 2020 as compared to employment generally. Although he indicated that COVID-19 was spreading, Dr. Sauer did not assert that Thiele's COVID-19 infection in 2020 was an ordinary disease of life to which the general public was already exposed in March and April 2020.

Viewing the evidence in the light most favorable to Thiele, we determine it could be construed that her particular work in early 2020 as a health care worker carried a higher risk of contracting COVID-19 than other employment and that she was more likely to suffer a serious infection because the early strain of COVID-19 was more virulent and resulted in more complications than later strains. Without repeating the complete record, there was evidence that the virus was rare in Nebraska in early April 2020 when Thiele became ill, and sick individuals were instructed to seek care at a hospital, such as Thiele's workplace. Knowledge gaps in policies and regarding personal protective equipment for nurses increased the risks for hospital workers at Select, and neither Thiele nor most of her coworkers were permitted to wear face masks as protection from the airborne droplets that transmit COVID-19.

As we have explained above, an occupational disease need not be of the type that is exclusive to the worker's employment, but the unique condition of the employment must result in a hazard that distinguishes it in character from employment generally. See, *Jordan v. Morrill County*, 258 Neb. 380, 603 N.W.2d 411 (1999); *Ritter v. Hawkeye-Security Ins. Co.*, 178 Neb. 792, 135 N.W.2d 470 (1965). Because there is a genuine issue of material fact as to whether Thiele's COVID-19 infection contracted in early 2020 was an occupational disease or a disease of ordinary life, the compensation court erred when it granted summary judgment in favor of appellees.

## VI. CONCLUSION

The compensation court erred when it reasoned that given the prevalence of COVID-19 in 2022, Thiele's COVID-19 infection contracted through her work at hospital facilities in

March and early April 2020 was an ordinary disease of life under § 48-151(3) and not compensable. Viewing the evidence in a light most favorable to Thiele and giving her the benefit of all reasonable inferences deducible from the evidence presented at the summary judgment hearing, we determine there is a genuine issue of material fact whether Thiele's COVID-19 infection contracted in early 2020 was a compensable occupational disease or a noncompensable disease of ordinary life. We reverse the order of the compensation court and remand the cause for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

CASSEL, J., concurring.

It seems to me that the dissenting opinion contains much that should provide guidance to the trial court on remand. But I agree that a genuine issue of material fact exists, which precludes summary judgment in favor of the employer. In my view, this case illustrates why summary judgment is a procedure that should be employed rarely, if ever, in the Nebraska Workers' Compensation Court. Therefore, I concur in this court's judgment reversing the summary judgment of the trial court and remanding the cause for further proceedings.

STACY, J., dissenting.

I disagree with the plurality's reasoning and holding, and respectfully dissent. Nebraska's statutory definition of "[o]ccupational disease" expressly excludes "all ordinary diseases of life to which the general public is exposed."[1] On this record, there was undisputed medical evidence that COVID-19 is an ordinary disease of life to which the general public is exposed. As such, I think the Workers' Compensation Court correctly determined the employer was entitled to summary judgment as a matter of law, and I would affirm the judgment.

---

[1] Neb. Rev. Stat. § 48-151(3) (Reissue 2021).

Christine Thiele contends that she contracted an occupational disease when she became infected with the COVID-19 virus in April of 2020, and she alleges that acute post-COVID-19 symptoms have prevented her from returning to work. Nebraska appellate courts have not previously considered the circumstances, if any, under which a contagious virus like COVID-19 might satisfy the definition of "occupational disease" under the Nebraska Workers' Compensation Act. We granted bypass to address that issue of first impression. But due to the nature of the plurality decision rendered in this appeal, binding authoritative guidance on that issue will have to wait for a future appeal.

Although a four-justice plurality concludes the Workers' Compensation Court erroneously entered summary judgment and thus remands the cause for further proceedings, the reasoning of the plurality's lead opinion is endorsed by only three justices. Three other justices dissent from both the reasoning and the holding of the plurality, and I read the concurring opinion to stop short of endorsing the reasoning of either the lead opinion or the dissenting opinion. Because there is not majority support for the reasoning of any of the opinions issued in this appeal,[2] there is not yet binding legal precedent in Nebraska on the compensability of COVID-19 as an occupational disease, nor is there consensus on the proper framework for determining when a contagious disease falls within the statutory exclusion for ordinary diseases of life.

Because I disagree with the analytical framework proposed by the plurality's lead opinion, I begin by examining Nebraska's occupational disease statute and related case law to identify the legal principles that govern analysis of whether a disease falls within the statutory exclusion for ordinary diseases of life. I then apply those principles to the evidence adduced on summary judgment and explain why, on this

―――――――――
[2] See Neb. Const. art. V, § 2 ("majority of the members sitting shall have authority to pronounce a decision").

record, the Workers' Compensation Court correctly determined there is no genuine dispute of material fact about whether COVID-19 is an ordinary disease of life. Finally, I address practical concerns with some of the new propositions of law endorsed by the plurality.

## OCCUPATIONAL DISEASE
## COVERAGE IN NEBRASKA

The plurality's lead opinion cites a string of cases from other jurisdictions for the general proposition that common infectious diseases like tuberculosis and hepatitis "can be considered occupational diseases." But I am not persuaded those cases provide any meaningful benchmark for analyzing occupational diseases under Nebraska's definition. This is so because although most states' workers' compensation schemes now allow some coverage for occupational disease,[3] statutory definitions of the term vary widely from state to state.[4] Some statutes contain elaborate definitions, others more general definitions, and some do not define the term at all.[5] Some statutes contain schedules listing the specific diseases that are considered occupational and limiting coverage to certain occupations, while others combine a list-type schedule with a more general definition.[6] Some statutory schemes include presumptions of coverage for certain diseases,[7] including COVID-19.[8]

---

[3] See, generally, 4 Arthur Larson et al., Larson's Workers' Compensation Law § 52.07 at 52-72 (2023) (noting "[s]ince 1950, the number of states having occupational disease coverage has grown from forty-four to fifty . . .").

[4] See, generally, *id*., §§ 52.03[2] and 52.04 (and statutes discussed therein). See, also, 2 Mark A. Rothstein et al., Employment Law § 7:24 (6th ed. 2019) (discussing various approaches to defining occupational disease).

[5] See *id*.

[6] See 4 Larson et al., *supra* note 3, §§ 52.02 and 52.04[1].

[7] See *id*., § 52.07[2].

[8] See *id*., § 51.06[2] (discussing legislative changes in some states to address compensability of COVID-19 during pandemic).

And some statutory definitions, like Nebraska's, expressly exclude ordinary diseases of life,[9] while others do not.[10] This explains why hepatitis B can be considered an occupational disease in one state but not another.[11] Because the task at hand is determining whether COVID-19 is an occupational disease under Nebraska's statutory definition, holdings from other states, considering different diseases, under different statutory frameworks, offer little guidance. I focus instead on Nebraska's statutory definition of occupational disease and our cases construing and applying that definition.

## Occupational Disease Under Nebraska Workers' Compensation Act

To recover benefits under the Nebraska Workers' Compensation Act,[12] a claimant must prove, by a preponderance of the evidence, that either an "accident" or an "occupational disease" arising out of and occurring in the course of employment proximately caused a compensable injury.[13]

Nebraska's definition of occupational disease has changed over time. When the Nebraska Legislature adopted the Workmen's Compensation Law in 1913, only injuries caused "by accident" and arising out of and in the course of employment were compensable,[14] and compensable injuries were

---

[9] See, e.g., § 48-151(3); Mich. Comp. Laws Ann. § 418.401(2)(b) (Cum. Supp. 2023); Ind. Code Ann. § 22-3-7-10(a) (LexisNexis 1997).

[10] See, e.g., Conn. Gen. Stat. Ann. § 31-275(15) (West 2023); Utah Code Ann. § 34A-3-103 (LexisNexis 2011).

[11] Compare, e.g., *Hansen v. Gordon*, 221 Conn. 29, 602 A.2d 560 (1992) (holding hepatitis B is occupational disease because dental hygienist was exposed to higher risk of contracting disease compared to employment generally), with *Fulton-DeKalb Hosp. Authority v. Bishop*, 185 Ga. App. 771, 365 S.E.2d 549 (1988) (holding hepatitis B is ordinary disease of life to which general public is exposed and not occupational disease).

[12] Neb. Rev. Stat. §§ 48-101 to 48-1,117 (Reissue 2021).

[13] See § 48-101.

[14] See Comp. Stat. § 48-101 (1929).

defined to expressly exclude all "occupational disease in any form, or any contagious or infectious disease contracted during the course of employment."[15] In 1935, the Legislature expanded the definition of the term "injury" to include occupational diseases in a few select industries,[16] but retained a blanket exclusion for any contagious or infectious diseases.[17]

In 1943, the Legislature amended the workers' compensation act to allow broader recovery for injuries caused by occupational disease.[18] It did so by amending § 48-101 to provide that compensable injuries include those caused "by accident *or occupational disease*, arising out of and in the course"[19] of employment, and by adding the following statutory definition of "occupational disease":

> The term "occupational disease" shall mean only a disease which is due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process or employment and to exclude all ordinary diseases of life to which the general public are exposed.[20]

The 1943 amendments also expanded the definition of the terms "injury" and "personal injury" to "include disablement resulting from occupational disease arising out of and in the course of the employment in which the employee was

---

[15] Comp. Stat. § 48-152(b) (1929).

[16] See Comp. Stat. § 48-152(b) (Supp. 1937) ("[T]he . . . terms [injury and personal injury] shall in no case be construed to include occupational disease in any form, except occupational diseases which arise out of and during the course of employment and are peculiar to the smelting, metal refining, or battery manufacturing industries, and which are contracted by workmen employed in said industries . . . . Said terms shall not be construed to include any contagious or infectious disease contracted during the course of employment . . .").

[17] See *id.*

[18] See 1943 Neb. Laws, L.B. 230, ch. 113, § 1, p. 397.

[19] Neb. Rev. Stat. § 48-101 (1943) (emphasis supplied).

[20] See 1943 Neb. Laws, L.B. 230, ch. 113, § 3, p. 398.

engaged and which was contracted in said employment."[21] The stated purpose of the 1943 amendment was threefold:

> to provide that the benefits of the Workmen's Compensation Act shall extend to injuries to employees caused by occupational disease arising out of and in the course of employment; to define the term "occupational disease", as used in this act[;] and to specifically exclude certain causes of death or disability from such term.[22]

When identifying which diseases are excluded from the term "occupational disease," the Legislature replaced the previous exclusion for "any contagious or infections disease" with a broad exclusion for "all ordinary diseases of life to which the general public are exposed."[23] Except for a modification to the verb form,[24] this exclusionary language has remained unchanged since 1943.

A plain reading of Nebraska's current statutory definition of the term "occupational disease" reveals two distinct clauses. The first clause describes the criteria for inclusion in the term, and the second clause describes the criteria for exclusion. Implicitly acknowledging both clauses, we said in 1965 that the statutory definition requires that "the cause and conditions of the disease be characteristic of and peculiar to the employment *and* that the disease be other than an ordinary disease of life."[25] And we repeated that proposition in subsequent cases.[26]

---

[21] *Id*.

[22] See Legislative Journal, 56th Leg., 1st Sess. 1678 (May 27, 1943).

[23] See 1943 Neb. Laws, L.B. 230, ch. 113, § 3, p. 398.

[24] Compare Neb. Rev. Stat. § 48-151 (1943) ("to which the general public are exposed"), with § 48-151(3) (Reissue 2021) ("to which the general public is exposed").

[25] *Ritter v. Hawkeye-Security Ins. Co.*, 178 Neb. 792, 795, 135 N.W.2d 470, 472 (1965) (emphasis supplied).

[26] *Miller v. Goodyear Tire & Rubber Co.*, 239 Neb. 1014, 480 N.W.2d 162 (1992); *Abbott v. Gould, Inc.*, 232 Neb. 907, 443 N.W.2d 591 (1989).

The two clauses in Nebraska's definition serve different, but closely related, purposes.[27] The purpose of the first clause is to distinguish diseases that are associated with the hazards of a particular employment from those that might just as readily be contracted in any work environment. And the purpose of the second clause is to exclude altogether ordinary diseases that might just as readily be contracted in everyday life.[28]

## Nebraska Case Law on Occupational Disease

Over the years, this court has developed legal standards to assist in construing the first clause of the occupational disease definition, but not the second. For instance, when considering if a disease is peculiar to a particular trade or occupation, we have explained that "[a]n occupational disease must be a natural incident of a particular occupation and must attach to that occupation a hazard which distinguishes it from the usual run of occupations and which is in excess of that attending employment in general."[29] We have also said that an occupational disease does not need to "originate[] exclusively from the employment" but "the conditions of the employment must result in a hazard which distinguishes it in character from employment generally."[30]

But Nebraska appellate courts have not previously articulated any specific legal standards to assist in determining when a disease falls within the exclusionary clause for "ordinary

---

[27] See, e.g., 4 Larson et al., *supra* note 3, §§ 52.03[1] at 52-5 (observing that various definitions of occupational disease "should always be checked against the purpose for which they are uttered").

[28] See, e.g., *id.* at § 52.03[2] at 52-7 (noting common purpose running through various definitions of occupational disease is to distinguish diseases "which might just as readily be contracted in other occupations" or "in everyday life apart from employment").

[29] *Ritter, supra* note 25, 178 Neb. at 794, 135 N.W.2d at 472.

[30] *Id.* at 795, 135 N.W.2d at 472.

diseases of life to which the general public is exposed."[31] Perhaps that is because, as the plurality notes, the issue turns largely on medical evidence rather than judicial rules.[32]

Although Nebraska has not adopted specific legal standards to assist in determining when a disease is an ordinary disease of life, our cases provide guidance. For instance, in *Brown v. Armour & Co.*,[33] the employee alleged that he contracted the bacterial disease leptospirosis through contact with animal excrement while working at a meatpacking plant. The medical evidence showed that leptospirosis is primarily a disease of rodents but that humans, domestic animals, and livestock can also become infected. Medical experts testified that leptospirosis was "not a new disease in this country[,] but is apparently a newly recognized disease,"[34] and that only 3 of the 32 known variants were found in the United States. At trial, the parties offered contradictory medical evidence as to which variant the employee contracted and whether he showed symptoms of the disease before starting work at the meatpacking plant. This court ultimately concluded that even if the employee could prove he had been infected with a variant of leptospirosis that was present in the United States and associated with livestock, he had not proved an occupational disease within the meaning of § 48-151 because there was "no evidence in the record that leptospirosis or any of its [variants] are characteristic of or peculiar to the meat-packing industry or the particular work

---

[31] See § 48-151(3).

[32] See, e.g., *Osteen v. A. C. and S., Inc.*, 209 Neb. 282, 287, 307 N.W.2d 514, 518 (1981) (describing medical evidence and concluding there was "sufficient competent medical evidence to support the . . . finding that peritoneal mesothelioma is a compensable occupational disease"). Accord *Fairfax County Fire and Rescue v. Mottram*, 263 Va. 365, 559 S.E.2d 698 (2002) (observing that question whether disease is ordinary disease of life is medical issue to be determined based on evidence presented.)

[33] *Brown v. Armour & Co.*, 168 Neb. 835, 97 N.W.2d 342 (1959).

[34] *Id*. at 837, 97 N.W.2d at 343.

in which plaintiff was engaged."[35] Presumably because the plaintiff failed to satisfy the first clause of the definition, the opinion in *Brown* did not address whether leptospirosis was an ordinary disease of life.

In *Riggs v. Gooch Milling & Elevator Co.*,[36] the employee worked for years in a grain elevator where he "inhal[ed] . . . wheat dust in large quantities over a large period of time." He developed severe shortness of breath, was diagnosed with emphysema, and sought workers' compensation benefits, alleging that emphysema was an occupational disease acquired in the course of his employment. We discussed the medical evidence adduced by the parties and concluded emphysema was a compensable occupational disease, reasoning:

> It is clear from the record that plaintiff worked in wheat dust in unusual amounts during the 15 years he was employed by the defendant. Wheat dust is characteristic of the operations of a grain elevator and is peculiar to it within the meaning of the act. Any disease or condition arising from working continuously in wheat dust is not an ordinary disease of life to which the general public is exposed within the contemplation of the statute.[37]

In *Ritter v. Hawkeye-Security Ins. Co.*,[38] the claimant was employed for 2 years as a restaurant dishwasher where he used a variety of commercial detergents, scouring powders, and bleaching agents. He developed a rash on his hands and was diagnosed with severe contact dermatitis; it was undisputed that he acquired the condition at work. Although the *Ritter* opinion described evidence that contact dermatitis "is a condition that occurs frequently and is common among

---

[35] *Id*. at 840, 97 N.W.2d at 345.

[36] *Riggs v. Gooch Milling & Elevator Co.*, 173 Neb. 70, 75, 112 N.W.2d 531, 534 (1961).

[37] *Id*. at 73-74, 112 N.W.2d at 533.

[38] *Ritter, supra* note 25.

housewives,"[39] the opinion did not find the employee's dermatitis to be an ordinary disease of life. When explaining why, the court appeared to conflate the first and second clauses of the definition, reasoning:

> The evidence in this case does not establish that the plaintiff's disease is an ordinary disease of life. The evidence is that contact dermatitis results from the use of a sensitizing or irritating agent and that detergents and cleansing chemicals are common causes of the disease. The evidence establishes that the cause and conditions of the disease are characteristic of and peculiar to the occupation of dishwashing and that dishwashing involves a hazard which is greater than that which occurs in employment generally.[40]

To the extent *Ritter* can be read to suggest that if a disease is characteristic of or peculiar to the employment it is, ipso facto, not an ordinary disease of life, such reasoning would effectively read the exclusionary clause out of the statutory definition altogether, and thus would contravene settled principles of statutory construction.[41] Although the language *Ritter* used was imprecise, it appears the court was attempting to distinguish the employee's disease from ordinary diseases of life by focusing on evidence that regular exposure to the harsh detergents and chemicals used in the occupation of dishwashing presented a unique hazard that was greater than occurred in everyday life.

---

[39] *Id*. at 794, 135 N.W.2d at 471.

[40] *Id*. at 795, 135 N.W.2d at 472.

[41] See, e.g., *SID No. 596 v. THG Development*, 315 Neb. 926, 942, 2 N.W.3d 602, 616 (2024) ("[t]o give effect to all parts of a statute, an appellate court will attempt to reconcile different provisions so they are consistent, harmonious, and sensible, and will avoid rejecting as superfluous or meaningless any word, clause, or sentence"); *Porter v. Knife River, Inc.*, 310 Neb. 946, 970 N.W.2d 104 (2022) (same).

Our opinion in *Osteen v. A. C. and S., Inc.*,[42] contains perhaps the most comprehensive discussion of the type of medical evidence that will support a finding that a particular disease is not an ordinary disease of life to which the general public is exposed. In *Osteen*, the employee worked as an insulator for more than 30 years and was regularly exposed to asbestos. He died from peritoneal mesothelioma, described as "a rare form of abdominal cancer caused by exposure to asbestos particles,"[43] and his widow sought workers' compensation benefits, alleging that his death was caused by an occupational disease. There was medical evidence to support the conclusion that mesothelioma was a disease caused by conditions that were peculiar to asbestos workers, in that approximately 60 to 80 percent of the workers who died of mesothelioma had a history of prolonged exposure to asbestos in their employment. There was also medical evidence supporting the conclusion that mesothelioma was not an ordinary disease of life, because "the incidence of peritoneal mesothelioma is almost negligible in the population at large, but approaches 7 percent in asbestos workers."[44] We concluded this was "sufficient competent medical evidence to support the [trial court's] finding that peritoneal mesothelioma is a compensable occupational disease."[45]

These cases illustrate two important principles in our occupational disease jurisprudence. First, even when the evidence shows that a disease was acquired at work, it will not be considered an occupational disease unless there is competent medical evidence showing the disease was acquired due to causes or conditions that are characteristic of and peculiar to the specific employment.[46] Second, a disease acquired

---

[42] *Osteen, supra* note 32.

[43] *Id.* at 284, 307 N.W.2d at 517.

[44] *Id*. at 286-87, 307 N.W.2d at 518.

[45] *Id*. at 287, 307 N.W.2d at 518.

[46] See, e.g., *Brown, supra* note 33.

at work is not necessarily excluded from the definition of occupational disease merely because the disease can also be acquired outside the work environment. Instead, if there is competent medical evidence showing the conditions or hazards that caused the disease in the work environment are meaningfully different from the conditions or hazards that cause the disease in everyday life, the disease may be found to be occupational and not an ordinary disease of life. [47]

In the sections that follow, I apply the statutes and principles discussed above to the medical evidence in the record to explain why I think the trial court's summary judgment ruling was correct and should be affirmed. Before doing so, it is necessary to supplement the plurality's discussion of both the evidence adduced by the parties and the reasoning of the Workers' Compensation Court.

## SUMMARY JUDGMENT

### Employer's Medical Evidence

The employer, Select Specialty Hospital, offered a report from Dr. Todd Sauer describing the general nature of the COVID-19 virus, including how it is acquired, how it spreads, and the range of symptoms that can be experienced. Sauer stated that "Coronovirus disease," also called COVID-19, is a respiratory virus caused by "SARS-CoV-2, a virus from the coronavirus family." He explained that COVID-19 is spread

> through contact with a surface that has viral particles or through the air when an infected person coughs, sneezes, talks or breathes. It infects people of all ages, genders, and races. The range of illness it produces is very wide.

---

[47] See, e.g., *Riggs, supra* note 36; *Ritter, supra* note 25; *Osteen, supra* note 32. See, also, 4 Larson et al., *supra* note 3, § 52.03[3][a] and [b] at 52-11, 52-13 (explaining that ordinary diseases of life can be distinguished from occupational diseases "[i]f the employment is attended with unusual germs, poisons, chemicals, fumes, dust, spores, or similar conditions" or when "familiar harmful elements are present to unusual degree" in the work environment).

Infected people can be asymptomatic and are not even aware they have the infection. Other people have a mild, cold-like illness. And yet others can get extremely ill, and many people have died from the infection.

Sauer further explained the COVID-19 virus was first identified in Wuhan, China, in "late 2019" and then became a global pandemic "spread[ing] around the world [and] infecting hundreds of millions of people." Sauer stated that the virus was spreading throughout the entire United Stated by late March 2020 and that "as of today," the virus had infected more than 88,066,096 people in the United States, the virus had caused more than 1 million deaths, and "most people in the United States have been exposed to the virus." He predicted that COVID-19 would continue to infect people in the United States for years to come, eventually becoming endemic "like influenza." Observing that the COVID-19 virus "spread in waves across our entire Nation through restaurants, stores, schools, and all social, public activities," Sauer opined that COVID-19 "is an ordinary disease of life to which the general public is exposed and will continue to be in the years ahead."

## THIELE'S MEDICAL EVIDENCE

Thiele offered medical reports from Drs. Sehr Haroon, Marco Gonzalez-Castellon, and Karen Wilson, all of whom addressed the risk of COVID-19 infection among frontline health care workers early in the pandemic. Haroon cited studies finding that health care workers who were exposed to COVID-19 patients "had [an] increased risk of covid [compared to] the general population early on in the pandemic, given their profession" and that "[f]rontline healthcare workers had a significantly increased risk of symptomatic covid infection, which was highest among healthcare workers with inadequate access to personal protective equipment who cared for [COVID-19] patients." The record contains no evidence that Thiele cared for COVID-19 patients, but Haroon stated that Thiele "did not need direct patient contact" to become

infected and opined that she "likely was exposed at work . . . via the work room where she was unmasked while an asymptomatic shedder was in that same space."

Gonzalez-Castellon and Wilson both stated that Thiele "was exposed to a higher risk of contracting [COVID-19] at her employment, a hospital/medical facility, than other employments or the general public." And both opined that Thiele more likely than not acquired her COVID-19 infection "at her workplace."

Neither Haroon, Gonzalez-Castellon, nor Wilson offered a medical opinion that COVID-19 is not an ordinary disease of life to which the general public is exposed. But Haroon was asked whether she disagreed with any of Sauer's statements or opinions, to which she replied:

> I agree that currently, covid is in the community. However, the argument at hand is not about today. It is about what the situation was when . . . Thiele contracted covid back in April 2020. At that time, covid19 was a more virulent variant[,] vaccines were not available, and treatment options we now rely on were not yet known. As a medical community, the science was evolving, which made it an interesting albeit traumatic time in modern medicine.

### Evidence of Local Community Spread in Early 2020

The record also contains several exhibits describing and documenting the community spread of COVID-19 throughout Nebraska, and the Omaha, Nebraska, area, prior to the date on which Thiele became infected. As relevant to the issues on appeal, this evidence showed that on March 19, 2020, a directed health measure was issued by the Nebraska Department of Health and Human Services (DHHS), stating that many areas of the United States were "experiencing 'community spread' of the virus that causes COVID-19" and that there were "confirmed cases" of community spread in the areas subject to

the directed health measure, which included Douglas County. Noting the "exposure is wide-spread and poses a significant risk of harm to people in the general population," DHHS implemented immediate restrictions on public gatherings in many indoor spaces "to minimize in-person interaction, which is the main means of transmission of COVID-19" and to "prevent, limit, or slow the spread of COVID-19." A press release dated March 29, 2020, reported that COVID-19 was spreading among long-term care residents in Douglas County. A news release dated April 6, 2020, reported that more than 400 COVID-19 cases had been reported statewide in Nebraska at that point. And an article published in April 2020 documented the community spread of COVID-19 among workers in meat and poultry processing facilities across the country, including in Nebraska.

## Compensation Court's Ruling
## on Summary Judgment

The plurality's lead opinion sets out some, but not all, of the undisputed facts identified by the Workers' Compensation Court based on the evidence presented by the parties. To provide context for the compensation court's analysis, I list some of the other facts the trial court found to be undisputed:

• COVID-19 is caused by a virus from the coronavirus family; it is a respiratory virus that is easily transmitted from person to person through close contact with an infected person, and it spreads easily throughout communities.

• The virus that causes COVID-19 is airborne and can infect people of all ages, races, and genders; the virus spreads when an infected person coughs, sneezes, talks, or breathes.

• COVID-19 was first identified in Wuhan, China, in late 2019, and the virus then spread around the world, infecting hundreds of millions of people.

• On March 6, 2020, the first COVID-19 infection was reported in Douglas County. On March 19, DHHS issued a directed health measure that prohibited public gatherings of more

than 10 persons in Douglas County. By April 6, 412 cases of COVID-19 had been reported in Nebraska, and there were "lockdowns" in the Omaha community.

• Thiele began experiencing symptoms of COVID-19 on April 6, 2020, and tested positive for the virus on April 10.

• COVID-19 has spread in waves across the United States through restaurants, stores, schools, and all social and public activities. At this point, most people in the United States have been exposed to COVID-19.

• COVID-19 is an ordinary disease of life to which the general public is exposed and will continue to be exposed in the years to come.

The compensation court began its summary judgment analysis by noting the employer did not contest that Thiele contracted COVID-19 while "working for Select." Therefore, the court did not address causation and focused instead on whether there was a genuine dispute as to whether COVID-19 is an occupational disease under § 48-151(3).

In doing so, the court primarily addressed the statutory exclusion under § 48-151(3) for "all ordinary diseases of life to which the general public is exposed." But it also briefly addressed the requirement that an occupational disease must be one that is "due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation, process, or employment." In that regard, the court noted that unlike the disease of emphysema considered in *Riggs* that was acquired after years of exposure to wheat dust in grain elevators, the contact dermatitis considered in *Ritter* that was acquired after years of exposure to harsh cleaning agents, or the mesothelioma considered in *Osteen* that was acquired after years of exposure to asbestos, COVID-19 is acquired the same way in all work environments and in the community at large. The court reasoned:

While each of these diseases (mesothelioma, emphysema and contact dermatitis) can be contracted outside of work, they were commonly associated with some sort of

substance unique to the injured worker's occupation. This is not true of [Thiele's] occupation or of COVID-19.

COVID-19 is not caused by a [work-related] substance like wheat dust or a product like Ajax or a mineral like asbestos. Instead, [it] is caused by a virus, SARS-CoV-2, which is from the same family of viruses that causes the common cold. COVID-19 is spread by close contact with an infected person. . . . It is, like other respiratory viruses, easily transmitted from person to person throughout communities. . . . COVID-19 spreads when an infected person coughs, sneezes, talks, or breathes. . . . While COVID-19 is more prevalent in the health care field, it is not characteristic or peculiar to healthcare workers. It is characteristic and peculiar to people, and people are found in every workplace.

The court ultimately concluded that due to the nature of COVID-19, it is "not related to an occupation" at all.

The court then considered the statutory exclusion for ordinary diseases of life. In that regard, it noted Sauer's unrefuted opinion that COVID-19 is an ordinary disease of life to which the general public is exposed, and it found that opinion was supported by evidence of how the virus is transmitted from person to person, and how quickly the disease spread through communities around the world, including Nebraska. The court also addressed Thiele's contention, which she repeats on appeal, that even if COVID-19 is generally considered an ordinary disease of life now, it was not an ordinary disease of life in April 2020 when she contracted it. The Workers' Compensation Court "gave careful consideration to this argument," but ultimately rejected it, reasoning:

The fact that there were only 412 cases in Nebraska [in April 2020] does not change the nature of COVID-19. While it was more virulent early on, COVID-19 was then, and remains today, a disease caused by a virus. It did not morph into something else once it spread to more and more people. Even though COVID-19 mutated

into milder variants over time, it remains at its core a disease caused by a virus. . . . As Dr. Sauer stated, COVID-19 started in China and spread across two continents infecting millions of people, and by March 2020, it was spreading throughout the United States. It was something everyone was susceptible [to] contracting, and that is why so many businesses were closed.

. . . .

. . . Dr. Sauer stated COVID-19 is a disease of ordinary life. The manner in which COVID-19 traveled from China to England to the United States and ultimately to Nebraska, supports that conclusion. Importantly, none of [Thiele's] experts refuted Dr. Sauer's opinion that COVID-19 is an ordinary disease of life. While early on in the pandemic, healthcare workers were more likely to catch COVID-19, that fact does not change the nature of what COVID-19 is. It remains a disease caused by a virus. That virus is anywhere people are. That is how [the disease] spread from one continent to another. It is not an occupational disease. Rather, it is a disease of ordinary life.

## SUMMARY JUDGMENT SHOULD
## BE AFFIRMED

When analyzing the compensation court's ruling, the plurality correctly recites the basic summary judgment standard, but does not mention our de novo standard of review or the shifting burden of proof. An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[48] Regarding the burden of proof, it is well settled that the party moving for summary judgment must make a prima facie case

---

[48] *Griffith v. LG Chem America*, 315 Neb. 892, 1 N.W.3d 899 (2024).

by producing enough evidence to show the movant would be entitled to judgment if the evidence were uncontroverted at trial.[49] If the moving party makes a prima facie case, the burden then shifts to the nonmovant to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law.[50]

Viewing the evidence de novo in the light most favorable to Thiele and drawing all reasonable inferences in her favor, I conclude the employer presented a prima facie case that COVID-19 is an ordinary disease of life through Sauer's opinions and other exhibits documenting the spread of COVID-19 throughout Nebraska in March and April 2020. Those exhibits showed that prior to Thiele's infection, COVID-19 outbreaks were being reported among residents in long-term care facilities in Nebraska and among workers in animal processing plants in Nebraska. And concerns of widespread exposure to COVID-19 in the general population prompted DHHS, on March 19, 2020, to prohibit public gatherings of more than 10 people in schools, daycares, gyms, salons, stadiums, conference rooms, theaters, libraries, and other confined spaces in Douglas County.

Sauer's report referred to the cumulative number of confirmed COVID-19 infections in the United States when he stated that "as of today," the virus had infected more than 88,066,096 people in the United States, the virus had caused more than 1 million deaths, and "most people in the United States have been exposed to the virus." But I see nothing in Sauer's opinion suggesting he was addressing only the current status of the disease when he described COVID-19 as an ordinary disease of life. To the contrary, his report addressed the nature and spread of COVID-19 on a comprehensive timeline that spanned from late 2019 up through the present,

---

[49] *Clark v. Scheels All Sports*, 314 Neb. 49, 989 N.W.2d 39 (2023).

[50] *Id*.

and his medical opinion that COVID-19 is an ordinary disease of life was not limited to any particular point on that pandemic timeline.

Once the employer established this prima facie case, the burden shifted to Thiele to produce evidence showing the existence of a material issue of fact that would prevent judgment as a matter of law.[51] But Thiele's medical evidence focused primarily on issues of causation, referencing studies showing that health care workers had an increased risk of contracting symptomatic COVID-19 early in the pandemic and offering medical opinions that she likely acquired COVID-19 at work. None of Thiele's medical experts opined that COVID-19 is *not* an ordinary disease of life to which the general public is exposed. Nor did Thiele present medical evidence suggesting that the manner in which she contracted COVID-19 at work was somehow different from the manner in which COVID-19 is contracted in the general community.[52]

And although Thiele argued to the court that COVID-19 was not yet a disease of ordinary life when she acquired it in April 2020, no medical expert offered such an opinion. Instead, Haroon stated, "I agree that currently, covid is in the community," and then Haroon referenced Thiele's argument directly when stating, "However, the argument at hand is not about today. It is about what the situation was when . . . Thiele contracted covid back in April 2020." But Haroon did not go on to opine that in April 2020, COVID-19 was not an ordinary disease of life or that the general public was not exposed to the disease. Instead, she stated that in April 2020, the disease was more virulent and medical science had not yet developed vaccines or discovered effective therapies. Even affording Thiele all reasonable inferences from this statement,

[51] See *id.*

[52] Compare, e.g., *Riggs, supra* note 36; *Ritter, supra* note 25; *Osteen, supra* note 32. See, also, 4 Larson et al., *supra* note 3, § 52.03[3][a] and [b].

it merely shows that the medical community's response to COVID-19 was still evolving in April 2020; it does not change the nature of the disease or contradict the medical evidence showing that in March and April 2020, COVID-19 was spreading rapidly through communities around the world, including Omaha, and had become a global pandemic to which the general public was exposed. In other words, Haroon's statements that COVID-19 was not well understood by the medical community early in the pandemic did not contradict Sauer's opinion that COVID-19 is an ordinary disease of life to which the general public is exposed. On this record, Thiele's evidence failed to show a genuine issue of fact regarding whether COVID-19 is an ordinary disease of life.

As noted earlier, to satisfy the statutory definition of occupational disease under Nebraska law, one must show both that "'the cause and conditions of the disease [are] characteristic of and peculiar to the employment *and* that the disease [is] other than an ordinary disease of life.'"[53] Proving that COVID-19 is not an ordinary disease of life was an essential element of Thiele's occupational disease claim, and a failure of proof on an essential element of the nonmoving party's claim necessarily renders all other facts immaterial on a motion for summary judgment.[54]

On this record, the evidence was undisputed that COVID-19 is an ordinary disease of life, and consequently, Thiele cannot prevail on her claim that COVID-19 is an occupational disease. The employer was entitled to summary judgment as a matter of law, and it is unnecessary to consider whether there was a genuine factual dispute about whether Thiele's COVID-19 infection was due to causes or conditions characteristic of and peculiar to her employment as a nurse liaison.

---

[53] *Miller, supra* note 26, 239 Neb. 1023, 480 N.W.2d at 169. See, *Abbott, supra* note 26; *Ritter, supra* note 25.

[54] *Clark, supra* note 49.

## PLURALITY'S ENDORSEMENT OF
## TEMPORAL REQUIREMENT

The plurality concludes that the compensation court's ruling must be reversed because of its "reliance on the situation in 2022" rather than "the period of March and April 2020." In finding this amounted to error, the plurality endorses a new proposition of law that "in cases claiming occupational disease, the proper focus is on the period of exposure prior to contraction or onset of symptoms to determine whether the illness was an ordinary disease of life at those times." As I explain, this temporal requirement is not found in the plain text of Nebraska's occupational disease statute, and I am not persuaded it finds support in either the case law or the occupational disease literature generally.

The plurality's lead opinion states:

As we read § 48-151(3), to be compensable as an occupational disease, a claimant must demonstrate that the disease stemmed from an identifiable period of time, and it logically follows that the claimant must establish that the exposure was not an ordinary disease of life during that same time period as ordinary disease of life is used in the statute.

I see no support for this construction either in the plain text of the statutory definition or in Nebraska case law. To the contrary, I see tension between the new temporal requirement endorsed by the plurality and our settled case law determining the date of injury in occupational disease cases.

Because occupational diseases typically develop over long periods of exposure to a particular work-related hazard, we have recognized the difficulty of identifying a precise date of injury for purposes of determining when an occupational disease claim accrues and the limitations period begins to run.[55] To bring clarity to that issue, this court has adopted the rule in occupational disease cases that the date of injury is understood

---

[55] See, e.g., *Hauff v Kimball*, 163 Neb. 55, 77 N.W.2d 683 (1956).

to be the date on which the employee becomes partially or totally disabled by the disease,[56] not the date when symptoms first appeared[57] or the disease was first diagnosed.[58] Because the plurality's new temporal requirement would define diseases of ordinary life using the date on which an employee's symptoms first appear, rather than the date on which the alleged occupational disease manifests into a disability, it is not clear to me how courts in Nebraska would reconcile these competing rules in future cases. Moreover, because Thiele's operative complaint alleges that her disability is due to "[a]cute postCovid symptoms," including "cardiovascular issues, neurological issues, [and] cognitive impairments," it is not clear to me whether the plurality's new rule would require the compensation court to focus on the time period just before the onset of Thiele's COVID-19 infection or the time period just before the onset of the post-COVID-19 symptoms she alleges prevent her from returning to work.

Nor do I find support for the new proposition of law in the extrajurisdictional cases cited in the plurality's lead opinion. The plurality cites several opinions from New York, some of them unpublished, for the rule that "in cases claiming occupational disease, the proper focus is on the period of exposure prior to contraction or onset of symptoms to determine

---

[56] See, e.g., *Ludwick v. TriWest Healthcare Alliance*, 267 Neb. 887, 678 N.W.2d 517 (2004) (occupational disease causes injury within meaning of act at point when disease has resulted in disability); *Hull v. Aetna Ins. Co.*, 247 Neb. 713, 719, 529 N.W.2d 783, 789 (1995) (in occupational disease case, date of injury is "the date that the employee becomes disabled from rendering further service"); *Hauff, supra* note 55 (in occupational disease case, date of injury is date when employee first experiences disability).

[57] See, e.g., *Hauff, supra* note 55, 163 Neb. at 61, 77 N.W.2d at 687 (claim for occupational disease accrues when injury to employee culminates in disability "'not from the time the employee has knowledge of the disease'").

[58] *Hull, supra* note 56 (holding dentist's contact dermatitis manifested into compensable disability when physician recommended dentist cease practicing, not when contact dermatitis was first diagnosed).

whether the illness was an ordinary disease of life at those times." But those New York cases address the compensability of COVID-19 under a theory of accidental injury, not occupational disease.[59] And the unpublished opinions from Virginia and Delaware, which the plurality cites for the proposition that "in COVID-19 cases, the factual focus for an ordinary disease of life analysis is at the time of onset, rather than in subsequent years," do not discuss such a rule.[60]

But there is a more fundamental reason to be cautious about relying on cases from other states regarding the compensability of COVID-19 claims. In addition to defining occupational disease differently than Nebraska, a number of states responded to the COVID-19 pandemic by issuing executive orders or enacting legislation that created a presumption of compensability for certain employees who contracted the disease at work.[61] No such presumption exists in Nebraska,[62] and this court

[59] See, *Aungst v. Family Dollar*, 221 A.D.3d 1222, 199 N.Y.S.3d 291 (2023) (addressing compensability of COVID-19 as work-related accidental injury); *Employer: Long Island DDSO*, No. G233 5526, 2022 WL 594590 (N.Y. Work. Comp. Bd. Feb. 16, 2022) (addressing presumption of compensability in accidental injury cases); *Employer: Manhattan Psychiatric Center*, Nos. G281 3814, G280 2169, 2021 WL 5748736 (N.Y. Work Comp. Bd. Nov. 29, 2021) (same).

[60] See, *Taylor v. Posey*, No. 1042-22-4, 2023 WL 5021240 (Va. App. Aug. 8, 2023) (addressing whether workers' compensation exclusivity provision barred wrongful death action against employer alleging negligence resulted in employee's COVID-19 infection); *Fowler v. Perdue Farm, Inc.*, No. CV K21A-01-002 NEP, 2022 WL 807327 (Del. Super. Mar. 16, 2022) (holding tribunal erred by rejecting unrebutted expert testimony on causation of COVID-19 infection and substituting its own purported expertise and extrajudicial knowledge regarding spread of disease).

[61] See 4 Larson et al., *supra* note 3, § 51.06[2] (identifying multiple states, including Virginia, that enacted legislation or issued emergency executive orders establishing presumption of compensability for COVID-19 infections).

[62] See, e.g., Neb. Rev. Stat. § 25-3604(3) (Cum. Supp. 2022) (providing Nebraska's COVID-19 Liability Act shall not be construed to affect rights under Nebraska Workers' Compensation Act).

should avoid importing the public policy decisions of other states into our occupational disease jurisprudence.

I am not persuaded that the academic literature on occupational disease supports the plurality's new temporal requirement either. Instead, when addressing the compensability of COVID-19 as an occupational disease, at least one treatise equates COVID-19 with other contagious diseases of ordinary life:

> Generally speaking, COVID-19 cannot be considered an occupational disease under most state acts. That is because the disease is not peculiar to a particular trade or industry. To be sure, health care workers are particularly susceptible to the contagious disease; they are, however, susceptible to a host of other diseases, including the common cold. Those diseases of ordinary life are generally outside the definition of occupational disease.[63]

Finally, setting aside the merits of the plurality's new requirement that courts must focus "on the period of exposure prior to contraction or onset of symptoms to determine whether the illness was an ordinary disease of life," I think such a requirement was met on this record. Sauer's report described how the contagious virus that causes COVID-19 is transmitted from person to person through close contact, and his report described the global community spread of COVID-19 in late 2019, in March and April 2020 just prior to Thiele's infection, in 2022, and into the future. Sauer's report addressed the community spread of COVID-19 on a comprehensive timeline that included the period just before Thiele contracted the disease, and his medical opinion that COVID-19 is an ordinary disease of life was not limited to any particular point on that pandemic timeline; rather, it encompassed them all. Moreover, the compensation court expressly focused on the timeframe when Thiele contracted the virus when it explained why, after careful consideration, it was rejecting

---

[63] 4 Larson et al., *supra* note 3, § 51.06[2] at 51-13.

Thiele's contention that in April 2020, COVID-19 was not yet an ordinary disease of life to which the general public was exposed. On this record, I cannot agree with the plurality's conclusion that the Workers' Compensation Court erroneously focused on the wrong timeframe when it concluded that Thiele's COVID-19 infection was an ordinary disease of life under § 48-151(3).

CONCLUSION

Section 48-151(3) expressly excludes from the definition of occupational disease "all ordinary diseases of life to which the general public is exposed." The employer presented competent medical evidence that COVID-19 is an ordinary disease of life to which the general public is exposed not just currently, but also when Thiele contracted the disease in April 2020. Because that medical evidence was unrefuted, Thiele cannot prevail on her occupational disease claim, and the employer was entitled to summary judgment as a matter of law. I would affirm the judgment of the Workers' Compensation Court.

Heavican, C.J., and Funke, J., join.